UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

RHYS ATHAYDE,

                 Plaintiff,

    v.

DOGPOUND FITNESS, INC., and KIRK MYERS,

                 Defendants.

-------------------------------------------------------------------X

Case No. 1:22-cv-9547

**COMPLAINT**

Plaintiff Rhys Athayde ("Athayde"), by and through his attorneys, Denlea & Carton LLP, for his Complaint against Dogpound Fitness, Inc. ("Dogpound"), and Kirk Myers ("Myers," and together, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.    This action seeks to recover the promised and legally mandated compensation and equity due to Athayde after he worked countless hours for Dogpound beginning before it first opened its doors.  Because of Athayde's hard work, Dogpound has grown into the very successful, luxury exclusive fitness operation that it is today.

2.    Athayde was part of the team that originally launched Dogpound gym in 2016 and became its first employee.  Athayde worked 16-hour days, seven days per week, beginning in 2015 and early 2016, and was paid only $300 hour per week (or $2.68/hour) and never received any overtime pay.

3.    In addition, beginning in 2015 and continuing throughout Athayde's tenure, Dogpound's founder, Myers, promised Athayde various amounts of equity in Dogpound as a reward for Athayde's high quality work and to induce him to continue working for the gym.

4.    In reliance on this promise, Athayde continued to spend long days and countless hours helping Dogpound become a success.  And it worked.  Dogpound is now a leading,

1

exclusive, high-end wellness community directed to A-list celebrities with locations in New York City and Los Angeles, as well as virtual operations.  It is also planning to open locations in Florida and the Middle East.

5.      Notwithstanding Myers' promises to award Athayde stock (and his assurances that he had awarded Athayde 1% of Dogpound's shares), Athayde never received any equity interest in Dogpound.  Instead, Myers refused to recognize the hard work that Athayde put into the success of Dogpound or the promises Myers made to Athayde over their years-long relationship.

6.      Athayde now brings this action to recover (a) the equity interest promised to him by Defendants and (b) the unpaid overtime wages that he is due under state law.

## PARTIES

7.      Plaintiff Athayde is an individual domiciled in Los Angeles, California.

8.      Defendant Dogpound is a Delaware corporation with its principal place of business located at 1 Renwick Street, New York, New York 10013.

9.      Defendant Myers is the Chief Executive Officer and Founder of Dogpound.

10.     Upon information and belief, Myers is domiciled in New York, New York.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction as Athayde and Defendants are citizens of different States, and the amount in controversy exceeds $75,000.00.

12.     Venue is properly laid in this Court pursuant to 28 U.S.C § 1391(b)(2) as the events underlying the claims herein occurred in the Southern District of New York.

## FACTUAL BACKGROUND

**A. Background on Parties**

13.     Athayde is an American entrepreneur, personal trainer, fitness instructor and social media personality with a significant following on different platforms, including over 130,000 followers on Instagram.

14.     Athayde is the founding trainer of Dogpound, a global lifestyle brand encompassing an exclusive, state-of-the-art gym that has gained worldwide notoriety through its training staff and famous clientele.

15.     As founding trainer, Athayde worked tirelessly, providing his investment of time and knowledge into this business.  Only with Athayde's dedication and expertise was Dogpound able to significantly increase its high-end clientele and reach a level where well-known celebrities became regulars.

**B. Athayde Begins Working with Myers**

16.     In 2013, Athayde was working at Gotham Gym, a gym in New York City, where Myers was an independent trainer.

17.     After several months of working together, Myers and Athayde became friends, and at Myers' request, Athayde agreed to serve as Myers' assistant to help him manage his private clients.

18.     After some time passed, Myers was interested in expanding his personal training activities and prepared a business plan.

19.     Myers then asked Athayde to review the business plan and eventually asked Athayde to ghostwrite plans for further developing his training business.

20.     In the spring 2015, Myers and Athayde left Gotham Gym and started working together at David Barton Gym, where Athayde's administrative work for Myers increased.

**C. The Parties Create Dogpound Fitness**

21.     In late 2015 and early 2016, Myers' training activities grew, and he, together with Athayde, created a new gym, Dogpound, eventually securing a location in New York City in February 2016.

22.     Athayde was officially Dogpound's first employee.

23.     At first, Athayde's responsibilities included training clients, scheduling all training sessions, serving as Myers' personal assistant, preparing for meetings with investors, attending advisory board meetings, creating training programs and performing other tasks as necessary to support the growth of a new high-end gym.

24.     Although Athayde worked upwards of sixteen hours per day for six or seven days per week (and entertaining phone calls from Myers during "off" hours, including in the middle of the night), his compensation was only $12.50 per hour for forty hours per week.

25.     That is, notwithstanding Athayde's long hours, Dogpound only paid him for 40 hours per week without regard to his actual hours worked.

26.     To induce Athayde to work for such low (and illegal) wages, Myers promised Athayde that he would receive "equity for everything you do for the company."

27.     Myers further assured Athayde that although his compensation was "not a lot," it would "only go up" as the gym grew successful.

28.     The culture at Dogpound was abusive as employees were supposed to come to work regardless of their health.

29.     For example, in spring 2016, just after Dogpound's grand opening party, smoke filled the gym when the air conditioning system malfunctioned.

30.     Despite the danger, Athayde ran into the gym to rescue two other employees.

31.     Athayde's rescue damaged his lungs leading to him being hospitalized in the intensive care unit for three days with a hole in his lung.

32.     Athayde still suffers from the effects of this injury, as it has exacerbated his asthma.

33.     Because being absent was a sign to Myers that an employee was not a "team player," Myers was critical of Athayde for having missed work because of his hospitalization.

34.     Notably, Dogpound did not provide scheduled days off for its employees until September 2016.

**D.  Myers Promises Athayde an Equity Interest in Dogpound**

35.     Despite Myers' criticism of Athayde missing time because he was in the hospital for injuries suffered at work, Athayde nonetheless worked tirelessly to promote the growth and development of Dogpound.

36.     In April 2016, Athayde was still working 50-60 hours per week and being paid $17.50 per hour for up to forty hours per week without regard to the overtime he worked.

37.     Even when later in the spring 2016, Athayde received a raise to $18.75 per hour and then $20.00 per hour, he was still working 50-60 hours per week, and Dogpound still did not compensate him for the hours he worked in excess of forty hours per week.

38.     Recognizing Athayde's hard work and invaluable contributions to the development and early successes of Dogpound, Myers routinely raised with Athayde the idea of granting him an equity interest in the gym.

39.     After Dogpound opened to the public in the spring 2016, Athayde regularly followed up with Myers concerning his promised equity interest in Dogpound.

40.     Myers consistently deferred Athayde's entreaties, assuring him that the equity interest would come at a later date.

41.     In an email sent on April 16, 2017, Myers confirmed that he wanted Athayde to have "some ownership in [the gym]" and in "the profit pool."

42.     Myers additionally told Athayde that he would "discuss with lawyers" on how to grant the stock equity.

43.     Myers thereafter emailed with attorney David Winkler to discuss how to effectuate granting Athayde his profit share interest in Dogpound.

44.     At the time, in 2017 and until his promotion, Athayde was still working approximately 50 to 60 hours per week and was still not being compensated for the hours he worked in excess of forty hours per week.

45.     In December 2018, Athayde was named Chief Experience Officer ("CXO") of Dogpound and became responsible for coordinating partnerships, social media, remote pop-up gyms, and client/trainer experience and protecting brand management.

46.     In that role, he continued to work in excess of 40 hours per week and generally did not receive overtime pay.

47.     Myers recognized Athayde's integral contributions as CXO and even sought to further increase his role.

48.     In fact, Myers repeatedly and publicly bragged about Athayde's importance to Dogpound on its Instagram account:



*Figure 1: Posted on Myers' Instagram in September 2019.*



*Figure 2: Posted on Dogpound Instagram in September 2019.*

49.     To further grow Athayde's leadership role, Myers repeatedly instructed Athayde to delegate more of his work so that Athayde could focus on "bigger things" and cement his leadership and managerial role.

50.     Myers went so far as to tell employees that if Myers was not around, Athayde was in charge, telling the staff, "when Kirk is gone, Rhys is Kirk."

51.     Myers so appreciated Athayde's role at Dogpound, that on April 2, 2019, he wrote in an email to Athayde: "I ♥ you."

52.     On September 26, 2019, in response to Athayde's continued follow up concerning the promised equity, Myers sent Athayde a letter of intent (the "Letter of Intent") summarizing the terms of Athayde's allocation of equity.

53.     According to the Letter of Intent, "as soon as reasonably practicable [sic]," Athayde was to be issued either 30,000 stock options or 30,000 shares of common stock of Dogpound (from Myers' stock), which reflected one percent of the total shares of Dogpound issued.

54.     Relying on the Letter of Intent, Athayde continued to work for below-market compensation and passed up other job opportunities for the promised benefit of Dogpound equity.

55.     Despite the explicit promises in the Letter of Intent, Myers took no action to effectuate the Letter of Intent until December 2019.

56.     Then, on or about December 26, 2019, Myers and Athayde had a conversation concerning Athayde's longstanding and integral contributions to Dogpound.

57.     In that conversation, Myers confirmed that, in addition to the equity addressed in the Letter of Intent, he (a) had provided Athayde with 1% of Dogpound's equity; and (b) would

grant Athayde 1-2% more equity when Dogpound raises additional financing or otherwise goes public.

58.     In an email on December 27, 2019, Myers confirmed what he told Athayde the prior day.

59.     In fact, around the same time, Myers assured Athayde that if Athayde did not receive the one percent of equity that Defendants promised him, Athayde would be able to bring a lawsuit to secure it.

60.     Myers also told Athayde that, given Athayde's contributions and importance to Dogpound, Athayde should receive 5-10% of the equity of Dogpound.

61.     By this time, Athayde was essentially running Dogpound's New York operations.

62.     In fact, in a text message on January 4, 2020, Myers wrote to Athayde:



63.     Immediately after this email, Myers referred to Athayde in an email as the "star WR [wide receiver]" of Dogpound who should be "focusing on catching[/]running routes and scoring TDS."

64.     Following this text message, Myers began saying that Dogpound would be undertaking a capital raise.

65.     Because of Myers' role as Chief Executive Officer of Dogpound, Athayde reasonably relied upon Myers' representations that Myers would convey equity in Dogpound to him.

66.     That is, Athayde reasonably took Myers at his word that Myers would have at least one percent of Dogpound's equity transferred to Athayde.

**E.  Athayde Leaves Dogpound**

67.     During the first two months of 2020, Dogpound continued exploring opportunities to grow into new markets.

68.     Once the COVID pandemic started, however, all plans were put on hold as Dogpound's facility closed.

69.     Throughout the year, Athayde worked with his colleagues to create programs conducive to remote and virtual operations.

70.     In fact, Myers wanted Athayde to be involved in a television concept for Dogpound, in which Athayde was to "tell [his] story" (because, as Myers said, "[Athayde's] story need[s] to be told").

71.     Nonetheless, Dogpound struggled.

72.     As a result, Dogpound and Myers looked for ways to avoid granting Athayde the equity interest that they promised him.

73.     As part of this plan, on December 3, 2020, Athayde received a "final warning" out of the blue where he was provided a series of (fictitious) complaints about him.

74.     This was the first warning Athayde ever received.

75.     Contrary to the representations in the email, Athayde never actually received any formal warnings in the past, which were required pursuant to Dogpound's Employment Handbook.

76.     Indeed, Athayde was not aware of any prior complaints from Dogpound management, employees or clients.

77.     In fact, there were no such prior complaints or warnings.

78.     Even after this baseless "warning," Myers provided Athayde yet another reassurance that he was in the "private army" and would be taken care of.

79.     In particular, Myers advised Athayde to stay with Dogpound rather than seeking other employment.

80.     Shortly thereafter, on December 13, 2020, Athayde received a lengthy email further detailing the "reasons" behind the "final warning," all of which directly contradicted all previous correspondence with Myers.

81.     In that email, Athayde was again informed the promised equity would be issued once a forthcoming 409A valuation of the company was complete.  Notably, Myers reattached the Letter of Intent to this email of reassurance.

82.     On January 8, 2021, Myers informed Athayde that the 409A valuation had been finalized and, as a result, Dogpound and Myers were working on timely issuing the promised equity.

83.     Nonetheless, the very next morning on January 9, 2021, Athayde was notified he was being furloughed, effective January 11, 2021.

84.     Despite this, Myers advised Athayde his stock options in the Letter of Intent would be presented at the next Board meeting.

85.     Athayde was informed in April 2021 that he was being terminated from Dogpound.

86.     To date, Athayde has not been awarded such equity or provided cash consistent with the value of same.

87.     Athayde was terminated in an effort to avoid granting him his equity interest that had been promised by Myers.

88.     Defendants' treatment of Athayde is consistent with other employees who were promised and/or awarded equity in Dogpound, such as Regilio Tuur.

89.     As a consequence of Defendants' wrongful acts, Athayde has been damaged in an amount to be determined at trial.

## FIRST CAUSE OF ACTION
Breach of Contract

90.     Athayde repeats and re-alleges the allegations set forth in paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.     On or about December 26, 2019, Defendants agreed to provide Athayde with a one-percent interest in Dogpound in light of Athayde's hard work and contributions to Dogpound.

92.     Myers failed to effectuate the issuance of the equity to Athayde.

93.     In addition, Defendants promised to award more equity to Athayde if certain events occurred, such as if Dogpound went public or raises additional financing.

94.     On the event of those events, rather than delivering the promised equity, Dogpound terminated Athayde without cause.

95.     In terminating Athayde and failing to deliver the promised equity, Defendants breached their agreement to Athayde, both its express terms and the implied covenant of good faith and fair dealing.

96.     Athayde has performed all his obligations pursuant to his understanding with Defendants.

97.     By virtue of Defendants' breach of their agreement with Athayde, Athayde has been deprived of the shares in Dogpound that he was awarded and accordingly, Athayde is entitled to a judgment for specific performance of the agreement directing Defendants to issue to Athayde his one-percent ownership in Dogpound properly and without dilution.

98.     In addition, Defendants' failure to transmit the shares to Athayde has damaged Athayde in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
Promissory Estoppel

99.     Athayde repeats and re-alleges the allegations set forth in paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    Through Athayde's tenure with Dogpound, Defendants intentionally and specifically promised, assured and represented to Athayde that due to his significant contributions and time and effort exerted for the benefit of Defendants, he would receive equity of *at least* 5-10% in Dogpound *and* 30,000 stock options or 30,000 shares of Myers' common stock.

101.    In fact, on or about December 27, 2019, Myers specifically affirmed that Athayde had been awarded 1% of the equity of Dogpound and would be entitled to more.

102.   As such, Athayde was instructed to continue to work tirelessly and contribute to the growth of Dogpound, and in exchange, Defendants agreed to compensate Athayde as set forth in detail herein.

103.   In so promising, assuring and representing the above, Defendants knew or should have known that Athayde would be reasonably induced to rely on Defendants' promises, assurances and representations and contribute his time and effort for the benefit of Defendants all while working at below market salary.

104.   Athayde reasonably relied on Defendants' promise, assurances and representation and was thereby induced to contribute his time and effort in connection with the development, growth and day-to-day operations of Dogpound.  More specifically, Athayde dedicated approximately five years to Dogpound, more than three of which were premised upon receiving equity in Dogpound as it grew into a flourishing fitness company with high-profile clientele.

105.   Defendants have not performed their part of the promise, assurances and representation in that they wrongfully ousted Athayde from Dogpound by terminating him and simultaneously refusing to provide Athayde with the promised equity and ownership interest.

106.   Athayde relied to his substantial detriment upon those promises.

107.   As a direct and proximate result of Defendants' conduct, Athayde has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
Quantum Meruit

108.   Athayde repeats and re-alleges the allegations set forth in paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.   At all relevant times herein, Athayde reasonably expected to receive an equity award in Dogpound for which he provided significant contributions to the growth of Dogpound.

110.    Having relied on the foregoing representation by Defendants, Athayde continued his employment with Dogpound and worked without receiving his overtime pay with the expectation of receiving at least 5-10% of the company in equity.

111.    Defendants greatly benefitted from the Athayde's services, which yielded substantial growth in Dogpound's profits and revenue, as well as favorable industry reviews and press coverage.

112.    Yet, Defendants failed to pay Athayde's promised equity award in exchange for those services.  Myers made the conscious decision to terminate Athayde so Defendants would not have to provide Athayde with any form of equity despite both verbal and written assurances, including a signed Letter of Intent.

113.    As a result of the wrongful acts of Defendants, Defendants have been unjustly enriched at the expense of Athayde.  Defendants have derived significant benefits from failing to compensate Athayde as promised.

114.    Defendants' retention of monies gained through their business practices, operations, and otherwise would serve to unjustly enrich Defendants and would be contrary to the interests of justice.

115.    As a direct and proximate result of Defendants' unjust enrichment, Athayde has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
Fraud

116.    Athayde repeats and re-alleges the allegations set forth in paragraphs 1 through 115 of this Complaint as if fully set forth herein.

117.    Upon information and belief, Defendants will assert that Myers did not have authority to grant Athayde equity in Dogpound.

118.    In the event Defendants assert that defense, it will mean that Defendants committed fraud when they, through Myers' statements – both written and verbal – to Athayde, promised Athayde equity in Dogpound.

119.    Myers knew his statements to Athayde were false as he was without authority to convey any equity in Dogpound to Athayde.

120.    Defendants, through Myers, made the statements to induce Athayde to continue working for Dogpound for unreasonably low compensation.

121.    Athayde reasonably relied upon Defendants' statements to continue working for Dogpound.

122.    As a direct and proximate result of Defendants' fraudulent statements, Athayde has been damaged in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
Violation of the New York Labor Law Art. 6

123.    Athayde repeats and re-alleges the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    Athayde was entitled to receive overtime payments at the rate of time-and-a-half for working more than forty hours per week at Dogpound under applicable law.

125.    Athayde was not paid overtime compensation owed to them during his employment with Athayde.

126.    Specifically, Athayde consistently worked up to sixty hours per week throughout his tenure at Dogpound and was paid only for a maximum of forty hours.

127.    This compensation did not include any allocation for overtime wages.

128.    Defendants' failure to pay Athayde the overtime wages due to him at the rate of time-and-a-half was willful.

129.     By reason of the foregoing, Athayde is entitled to recover damages from Defendants in an amount to be determined at trial, plus liquidated damages and attorneys' fees and costs.

**WHEREFORE**, Athayde respectfully requests that this Court enter judgment in his favor against Defendants as follows:

a.   For general and compensatory damages in an amount to be proven at trial;

b.   For judgment confirming Athayde's equity interest in Dogpound;

c.   For punitive and exemplary damages in an amount to be determined at trial;

d.   For liquidated damages;

e.   For costs, interests and attorneys' fees; and

f.   For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Athayde hereby demands trial by jury on all matters so triable.

Dated: November 8, 2022
          New York, New York

**DENLEA & CARTON LLP**

By: _____
Craig M. Cepler
2 Westchester Park Drive, Suite 410
White Plains, New York 10604
Tel.:  (914) 331-0100
Fax:  (914) 331-0105
ccepler@denleacarton.com
*Attorneys for Plaintiff Rhys Athayde*