UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

RHYS ATHAYDE,

                              Plaintiff,

        -against-

DOGPOUND FITNESS, INC., et al.,

                            Defendants.

-----------------------------------------------------------------X

22-CV-09547 (SN)

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Rhys Athayde (the "Plaintiff") sues Dogpound Fitness, Inc. ("Dogpound") and its former Chief Executive Officer, Kirk Myers (together, the "Defendants"), for breach of contract, promissory estoppel, fraud, quantum meruit, and New York Labor Law ("NYLL") overtime violations. The Defendants move for summary judgment on all five claims. The Defendants' motion is GRANTED as to the Plaintiff's breach of contract, promissory estoppel, fraud, and quantum meruit claims. The Defendants' motion is DENIED as to the Plaintiff's New York Labor Law claim.

## BACKGROUND

### I. Factual Background

Myers co-founded Dogpound, a luxury gym, in 2015. ECF No. 57, Ex. 4, Myers Tr., 79:11-13. At that time, the Plaintiff worked as a part-time assistant for Myers. ECF No. 56, Defendants' Statement of Uncontested Facts ("DSUF"), ¶ 14. Following a series of capital investments, investors were granted Preferred Stock and Myers was granted Common Stock; the Plaintiff did not receive any equity interest. Id. at ¶¶ 12-14. "As early as 2015 and through 2016,

discussions of potential future equity arise between [the Plaintiff] and [Myers], but no formal agreements, conversations, nor materials memorialize those remarks." Id. at ¶ 20. In 2016, Dogpound opened to the public, and the Plaintiff started training clients. Id. at ¶ 21. That year, the Plaintiff's role also included client acquisition, marketing, and launching both a new space and a boxing program. Id. at ¶ 22. The following year, the Plaintiff stepped "into a more substantial role in the business, along with more duties and responsibilities." Id. at ¶ 26.

In 2018, the Plaintiff was named Chief Experience Officer (CXO), "a title created by Dogpound to reflect the work Plaintiff was already doing at Dogpound." Id. at ¶ 35. The Plaintiff was paid $99,000 per year plus $10,000 quarterly bonuses. Id. at ¶ 36. As CXO, the Plaintiff established social media guidelines, delegated work to employees, and managed the business when the CEO was unavailable. Id. at ¶¶ 37-41.

Discussions about equity continued, and in September 2019, Myers provided the Plaintiff with an equity-related letter of intent ("LOI"). ECF No. 54, Drogin Decl., Ex. 13. That LOI contemplated granting the Plaintiff either 30,000 stock options or 30,000 shares of Myers's existing Common Stock and explained that the equity grant would be contingent on the approval of the Board of Directors. Three months later, the Plaintiff and Myers spoke on the phone about compensation and equity. Following the call, on December 27, 2019, Myers emailed the Plaintiff: "Great call as usual <3"; "1 % I just gave you"; and "Nonetheless you have my word on these 3; 1 % now from me." ECF No. 64, Cepler Decl., Ex. B. The Plaintiff, however, never received any equity and stopped working for Dogpound in 2020. He now seeks to enforce Myers's email and alleges that Dogpound did not pay him for all hours worked overtime.

## II.     Procedural Background

The Plaintiff filed this action on November 8, 2022. Two months later, the parties consented by the jurisdiction of a U.S. magistrate judge, and the case was assigned to me. In January 2024, the parties completed fact discovery, and the following month, the Defendants filed their motion for summary judgment.

## DISCUSSION

## I.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that no genuine issue of material fact exists. Id. at 256-57; see Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-23).

To defeat summary judgment, the non-moving party must produce more than a "scintilla of evidence" and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Anderson, 477 U.S. at 252; Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Flores v. United States, 885 F.3d 119, 122

3

(2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."). The non-moving party "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted). The Court must, however, "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**II.     Breach of Contract**

The Plaintiff asserts a breach of contract claim for the Defendants' failure to transfer him a one percent stake in Dogpound. In the Plaintiff's view, Myers's December 27, 2019 email constitutes an enforceable contract. The Defendants argue that the email's terms are too vague and indefinite to be enforceable.

"Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989). In the context of equity, courts have found agreements insufficiently definite where the parties fail to specify the form of equity. See, e.g., Benham v. eCommission Solutions, LLC, 118 A.D.3d 605, 607 (1st Dep't 2014) ("The failure of the parties to agree on the precise form of the equity stake causes plaintiff's contract claim to fail for lack of definiteness in the material terms of her equity compensation."); Khurana v. Wahed Invest, LLC, No. 18-cv-233 (LAK) (BCM), 2019 WL 1430433, at *9 (S.D.N.Y. Feb. 26, 2019), R. & R. adopted, 2019 WL 1432589 (Mar. 29, 2019) (dismissing breach of contract claim due to

4

indefinite material terms because plaintiff "failed to allege the nature of the 'equity' he was to receive under the contract" ); Eagle v Emigrant Capital Corp., No. 650314/2013, 2016 WL 410072, at *4 (N.Y. Sup. Ct. Feb. 3, 2016) ("In the context of compensation agreements, New York courts have long held that a promise to give an equity interest or share of profits is unenforceable where the promise lacks definiteness as to the precise form, amount, or accrual of such compensation.") (collecting cases); Foster v. Kovner, No. 601349/06, 2012 N.Y. Misc. LEXIS 203, at *23 (N.Y. Sup. Ct. Jan. 17, 2012) (finding promise for 10% equity share in company unenforceable because the parties never agreed on "vesting, buy-back, forfeiture and other options relating to the equity interests").

Even viewing the facts in the light most favorable to the Plaintiff, Myers's promise to compensate the Plaintiff with a one percent stake in Dogpound is too indefinite to be enforceable. In Myers's December 27, 2019 email to the Plaintiff, he wrote: "1 % I just gave you" and "1 % now from me." Cepler Decl., Ex. B. In 2019, when Myers sent the email to the Plaintiff, Dogpound had the authority to issue Common Stock, Series A Preferred Stock, and Series B Preferred Stock. DSUF, ¶ 29; Myers Tr., 127:11-128:24. But in Myers's email, he did not specify which form of equity he promised the Plaintiff. The Plaintiff does not point to any evidence showing that he and Myers ever discussed the nature of that one percent stake.[1] At his deposition, the Plaintiff made clear that he and Myers had discussed few details. ECF No. 54,

---

[1] The prior LOI had contemplated granting the Plaintiff equity "either in the form of Thirty-Thousand (30,000) stock options of Thirty-Thousand (30,000) shares of my existing Common Stock." Drogin Decl., Ex. 13. Accordingly, even in the LOI, Myers did not specify which precise form of stock he contemplated granting the Plaintiff. Additionally, the LOI does not mention any other equity-related terms, such as vesting, buy-back, or forfeiture details.

Drogin Decl., Ex. 3, Athayde Tr., 208:3-209:11. The Plaintiff testified that he did not know whether the promised one percent was voting stock or non-voting stock and added that he and Myers "didn't specify" whether the stock paid dividends. Id. When asked whether the stock could be diluted if further equity interests were issued, Plaintiff responded, "I asked Kirk, I said I didn't want that to happen, and I don't know what ended up becoming of that." Id. Because Myers and the Plaintiff failed "to agree on the precise form of the equity stake," Myers's email is too indefinite to constitute an enforceable contract. Benham, 118 A.D.3d at 607.

Additionally, the Plaintiff and Myers hold different views on whether Myers's email referred to one percent of the entire company, or one percent of Myers's own equity. Myers testified that he meant that he "could potentially give a percentage of [his] own equity to [the Plaintiff]." Myers Tr., 241:14-20, 242:19-243:3. This is supported by Myers emailing, "1 % now *from me.*" Cepler Decl., Ex. B (emphasis added). The Plaintiff, however, understood the promise to mean that he "owned 1 percent of the company." Athayde Tr., 190:12-16. Both interpretations had been contemplated in the LOI. Drogin Decl., Ex. 13. The parties' diverging understandings of "one percent" underscore that there was never a meeting of the minds, and the parties never formed an enforceable contract. No reasonable juror could find otherwise.

Given the indefiniteness of the email's terms and the lack of mutual assent between Myers and the Plaintiff, Myers's email does not constitute an enforceable contract. The Court therefore GRANTS the Defendants summary judgment on the Plaintiff's breach of contract claim.

### III.    Promissory Estoppel

The Plaintiff also seeks to use a promissory estoppel theory to enforce the Defendants' promise for a one percent stake in the company. "In New York, promissory estoppel has three elements: a clear and unambiguous promise, a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) (internal quotations omitted). For the reasons explained above, Myers's statements of "1 % I just gave you" and "1 % now from me" are indefinite and ambiguous. Accordingly, the Plaintiff cannot establish promissory estoppel's first element: a clear and unambiguous promise. See Benham, 118 A.D.3d at 607 ("The lack of definiteness in the promise of equity compensation is similarly fatal to plaintiff's promissory estoppel claim."). For that reason, the Court GRANTS the Defendants summary judgment on the Plaintiff's promissory estoppel claim.

### IV.    Fraud

The Defendants argue that the Court should dismiss the Plaintiff's fraud claim as duplicative of the breach of contract claim. New York law requires "that a fraud claim, raised in a case that stems from a breach of contract, be sufficiently distinct from the breach of contract claim." Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 306-07 (S.D.N.Y. 2010) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)). "It is well-established under New York law that a fraud claim, even where sufficiently pled, is not cognizable if it is based on the same facts that underlie a claim for breach of contract." Alexsam, Inc. v. MasterCard Int'l, Inc., No. 15-cv-2799 (ILG) (SMG), 2017 WL 9482100, at *6 (E.D.N.Y. Mar. 6, 2017), R. &. R. adopted, 2017 WL 3534997 (Aug. 17, 2017).

The same facts support the Plaintiff's contract and fraud claims: the Plaintiff contends that Myers's promise for a one percent stake constitutes both an enforceable contract and a fraudulent representation.

"To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract." Bridgestone, 98 F.3d at 20. The Plaintiff demonstrates neither. He points to no legally separate duty, and the fraudulent misrepresentation is itself the purported contract. Accordingly, the Plaintiff's fraud claim improperly duplicates his breach of contract claim. This is true even though the Court finds the purported contract unenforceable. See, e.g., Botanical Realty Assoc. Urban Renewal, LLC v. Gluck, 179 A.D.3d 633, 634 (2nd Dep't 2020) (dismissing fraud claim as duplicative of a breach of contract claim even though the court found the contract unenforceable); Doller v. Prescott, 167 A.D.3d 1298, 1301-02 (3rd Dep't 2018) (finding equity-related contract unenforceable for lack of definiteness and dismissing fraud claim as duplicative of breach of contract claim).

The Plaintiff argues that the Court should not find the claims duplicative because "the Court should recognize the claims are alternative." Pl. Opp. at 14. But the Plaintiff did not plead his claims in the alternative. The Defendants points this out in their opening brief, and the Plaintiff does not address the issue in his opposition. Def. Br. at 13; Pl. Opp. at 14. The Plaintiff does not cite any cases of a court in this district interpreting a represented plaintiff's claims as alternative when the complaint did not specify them as such. Accordingly, the Plaintiff cannot save his fraud claim by now identifying it as alternative at summary judgment.

8

Even if the Plaintiff's fraud claim did not duplicate his breach of contract claim, he nonetheless has failed to establish reasonable reliance on Myers's promise. The elements of fraud are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). The LOI – sent to the Plaintiff months before Myers's email promise – advised the Plaintiff that any grant of equity would be contingent on Board approval. Accordingly, no reasonable juror could find that it was reasonable for the Plaintiff to rely on Myers's assurance that he had unilaterally granted him equity on the spot, particularly given that there is no evidence that the Plaintiff ever received any confirmation or documentation of the purported equity grant following his email exchange with Myers.

For these reasons, the Court GRANTS the Defendants summary judgment on the Plaintiff's fraud claim.

## V.     Quantum Meruit

The Plaintiff asserts a quantum meruit claim.[2] To establish quantum meruit, a plaintiff must show: "(1) the performance of the services in good faith, (2) the acceptance of the services

---

[2] The Plaintiff pleaded a quantum meruit claim in his complaint. In the Plaintiff's opposition, he describes this as an unjust enrichment claim, never using the term "quantum meruit." Pl. Opp. at 14. The Defendants write in their reply that "under New York law, courts analyze quantum-meruit and unjust-enrichment claims together as a single quasi-contract claim." Def. Rep. at 6. To clarify, quantum meruit is a particular theory of unjust enrichment, but there exists a "distinction between claims for quantum meruit and those for unjust enrichment." Georgia Malone & Co., Inc. v. Rieder, 19 N.Y.3d 511, 521 n.2 (2012). Because the Plaintiff pleaded only quantum meruit in his complaint, the Court considers only that claim at summary judgment.

9

by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Farina v. Bastianich, 116 A.D.3d 546, 548 (1st Dep't 2014). A quantum meruit claim "does not depend upon the existence of a contract, either express or implied in fact . . . . Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement." Dimes v. Geodis USA, Inc., No. 18-cv-649 (JCH), 2019 WL 10301654, at *33 (D. Conn. Aug. 14, 2019). To prevail on a quantum meruit claim, a plaintiff must establish that they did not receive the reasonable value of their services. Leibowitz v. Cornell Univ., 584 F.3d 487, 509 (2d Cir. 2009) (affirming dismissal of quantum meruit claim at summary judgment because the plaintiff "failed to establish that the rate she charged represented a reasonable value of her services"). The Plaintiff has established the first three elements: he worked for Dogpound, Dogpound accepted his work, and the Plaintiff expected to be paid for that work.

On the fourth element, however, there is no record evidence to allow a jury to find that the reasonable value of the Plaintiff's services required an equity interest in Dogpound. The Defendants argue that, with his salary and bonuses, the Plaintiff was adequately compensated for his work at Dogpound. Def. Br. at 13. The Plaintiff does not respond to this argument in his opposition. Based on the Plaintiff's complaint, it appears that he believes he was underpaid based solely on Myers's assurances that he would eventually be granted equity; in his summary judgment opposition, the Plaintiff provides no further explanation of the theory underlying his quantum meruit claim. But the Plaintiff's conversations with Myers cannot, on their own, support a finding that the Plaintiff was not compensated for the reasonable value of his services.

Otherwise, employees could use quantum meruit claims to enforce any mention of compensation that does not ultimately result in an enforceable contract, defeating the purpose of contract law.

Rather, it appears that the Plaintiff is improperly seeking to use his quantum meruit claim as "a catchall cause of action to be used when others fail." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012). Because the Plaintiff does not point to any evidence that would allow a reasonable jury to conclude that an equity stake was reasonable compensation for the employment services he rendered, the Court GRANTS the Defendants summary judgment on the Plaintiff's quantum meruit claim.

## VI. New York Labor Law

The Plaintiff asserts that the Defendants violated the NYLL by failing to pay him the required amount of overtime compensation. The Defendants contend that for the period between November 8, 2016, to December 31, 2018, the Plaintiff "was paid overtime, so nothing is owed." Def. Br. at 17. The Defendants further argue that from January 1, 2019, through the end of his time at Dogpound, the Plaintiff's role as Chief Experience Officer exempted him from NYLL's overtime provisions. Id. Factual disputes exist as to both periods.

### A. Overtime Hours

The Defendants rely on payroll records to support their argument that, for the period between November 2016 to December 2018, they paid the Plaintiff all required overtime. Drogin Decl., Ex. 24. Those records show that the Defendants paid the Plaintiff overtime starting the week of November 4, 2017, but those records do not reflect any overtime payments between November 2016 to November 2017. Id. In the Defendants' view, this reflects that the Plaintiff did not work overtime during that period. Dogpound's former Chief Financial Officer, Jenny

11

Liu, testified to the accuracy of the payroll system and explained that when there were mistakes, the Plaintiff reached out to her to have them corrected. Drogin Decl., Ex. 6, Liu Tr., 49:17-51:19. When asked what she would do if she saw zero overtime hours for an employee in the payroll system but had seen them working every day, Liu responded: "I don't think there was any cases like that I was aware of." Id. at 50:11-18. This supports the Defendants' contention that the payroll records accurately reflect the Plaintiff's hours.

The testimony of the Plaintiff and Dogpound co-founder Bryelis Pena tells a different story. First, Pena testified that the payroll system did not accurately track trainers' hours and "was always buggy." ECF No. 54, Drogin Decl., Ex. 5, Pena Tr., 44:2-45:17. Additionally, the Plaintiff testified that he worked many more overtime hours than reflected in the payroll system. He first estimated that he worked about 50 to 60 hours per week. Athayde Tr., 312:5-15. A few minutes later, after describing his day-to-day, the Plaintiff revised his estimate to 80 to 90 hours per week.[3] Id. at 315:14-316:6. Pena testified that from November 2016 to May 2017 (when Pena left the company), the Plaintiff worked from about 7:00 a.m. until 10:00 p.m. or 12:00 a.m., taking several breaks during the day. Pena Tr., 20:21-22:22. That would amount to about 13 to 15 hours per day, or about 65 to 75 hours per week. Pena's and the Plaintiff's testimony creates two pivotal factual disputes: whether the Plaintiff worked overtime hours not logged in the payroll system, and whether the payroll system accurately tracked hours.

---

[3] The Defendants argue that this testimony is so absurd that the Court should disregard it. But disregarding the Plaintiff's testimony would require the Court to make a credibility determination, which it cannot do at summary judgment.

In the Defendants' reply brief, they argue that the "vagaries in Plaintiff's own evidence" – specifically, the range in hours estimated by the Plaintiff at his deposition – "undermines a rational juror's ability to determine what, if anything, Plaintiff is owed to a just and reasonable inference." Def. Rep. at 10. "At summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference . . . . An employee's burden in this regard is not high." Kuebel v. Black & Decker Inc., 643 F.3d 352, 362 (2d Cir. 2011) (cleaned up). Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could determine the Plaintiff's hours to a just and reasonable inference. Despite the Plaintiff's range in overtime estimates at his deposition, his description of his day-to-day schedule aligned closely with Pena's description. Athayde Tr., 314:9-315:8; Pena Tr., 20:21-22:22. Accordingly, if a jury credited those descriptions, they could sufficiently determine the overtime hours worked by the Plaintiff.

The Defendants further argue that the Plaintiff "blurs the line between his friendship with [Myers] and time spent working, attributing all phone calls, and hanging out as working time." Def. Br. at 19-20. The Defendants point out that Liu testified that the Plaintiff and Myers "were friends on top of the business, you know, employee, boss there was also the friendship thing. So if [Myers] called [the Plaintiff] to have dinner with him for two hours and happy to talk about business, I don't think that would count as a business meeting, they're just, you know, they're also friends." Liu Tr., 269:10-18. But the Plaintiff routinely described such conversations with Myers as focused on work. See, e.g., Athayde Tr., at 282:6-12 ("[Myers] would call me while I was sleeping to talk work."); Id. at 284:22-285:8 ("[Myers] would be somewhere like Budapest

13

or something or in Qatar and then would basically still call or still, you know, can you work on this or can you take these clients on, what do you think of this."); Id. at 315:2-8 ("[Myers] calls me at let's call it midnight and those would be like, a two-hour conversation about, you know, the plans, what we are doing, you know, in terms of like not just Dogpound spaces but him wanting to do JVs and all these different things."). Accordingly, whether the Plaintiff's claimed hours include non-work-related conversations is a factual dispute for the jury to resolve.

The Defendants further argue that, as a matter of law, they cannot be held liable for any overtime hours not registered in the payroll system because employers "are not responsible for paying employees for time that they do not know about." Def. Br. at 18 (citing Perry v. City of New York, 78 F.4th 502 (2d Cir. 2023)). But an employer is responsible for compensating all work it "requires, knows about, or should know about . . . regardless of whether pay is requested and regardless of whether the employer knows the worker will not be paid." Perry, 78 F.4th at 512. "[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." Kuebel, 643 F.3d at 363.

Based on the testimony of the Plaintiff and Pena, the Plaintiff's overtime work mostly involved leading classes, training clients, or talking to Myers about the business. Athayde Tr., 314:9-315:8; Pena Tr., 20:8-22:12. A reasonable jury could conclude that the Defendants should have known about such work, even if those hours were not logged in the payroll system. To the extent that the Defendants claim they lacked actual or constructive knowledge of that overtime work, it is the role of a jury – not the Court – to resolve that tension. Perry, 78 F.4th at 523.

The Defendants also argue that they had no reason to know about the unpaid overtime because the Plaintiff did not follow the mechanism for reporting pay errors set forth in the Dogpound Handbook. But the Handbook was created in 2019, after the relevant time period. Drogin Decl., Ex. 17. Additionally, even if the Handbook had existed during the period between November 2016 and December 2018, this would not immunize the Defendants from liability because an employer "cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." Kuebel, 643 F.3d at 363. In Perry, the employer had required employees to certify that compensation was sought for all time worked including time outside of scheduled hours. Perry, 78 F.4th at 523. The court found that "these certifications surely constitute evidence relevant to the [employer's] knowledge of non-payment; but in light of the countervailing evidence, the jury was not required to accept the [employer's] claim." Id. Accordingly, even if the Defendants can establish that the Plaintiff failed to report overtime issues, a jury could nonetheless find that the Defendants had actual or constructive knowledge of the Plaintiff's overtime work. Id. at 512.

      **B.**      **Executive Exemption**

The Defendants assert that, starting in January 2019, the Plaintiff's new role as Chief Experience Officer exempted him from NYLL protection. "An employee falls within the executive exemption to NYLL's overtime requirement if (a) her 'primary duty' consists of managing the enterprise or a department or subdivision thereof; (b) she 'customarily and regularly directs the work' of two or more employees; (c) she 'has the authority to hire or fire other employees' or her suggestions to hire or fire are given particular weight; (d) she 'customarily and regularly exercise[s] discretionary powers;' and (e) her salary exceeds a

15

threshold requirement." Robinson v. Deniro, 614 F. Supp. 3d 73, 78 (S.D.N.Y. 2022) (citing 12 NYCCRR § 142-2.14(c)(4)). "The determination of whether or not an employee qualifies as exempt under the regulations . . . focuses on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in résumés, position descriptions, and performance evaluations." Martinez v. Hilton Hotels Corp., 930 F. Supp. 2d 508, 525 n.16 (S.D.N.Y. 2013) (cleaned up). The parties do not dispute that the Plaintiff's salary exceeded the threshold requirement. The Defendants cite facts showing that the Plaintiff's job duties as CXO satisfied the remaining factors. The Plaintiff cites facts showing the opposite.

As to whether the Plaintiff's primary duties involved managing Dogpound, the parties do not dispute that when "Myers was not around, individuals would go to Plaintiff with problems, questions, and concerns," and that the Plaintiff "was instructed by Myers to delegate his work to others who reported to him, so [the Plaintiff] could focus on bigger managerial tasks." DSUF, ¶¶ 38, 40. But the Plaintiff testified that, although employees came to him with complaints, he "would never be able to take full action" on those complaints. Athayde Tr., 141:17-23. Instead, he would have to communicate them to another executive. Id. Additionally, the Plaintiff testified that as CXO, his "day-to-day was mainly training," rather than managing the company. Id. at 132:23-133:2. "In considering whether a duty is 'primary,' courts consider . . . the amount of time the employee spends performing exempt work." Robinson, 614 F. Supp. 3d at 78. Viewing the evidence in the light most favorable to the Plaintiff, his testimony indicates that, as CXO, he spent most of his time acting as a trainer, not a manager. Accordingly, a reasonable jury could find that the Plaintiff's primary duties did not consist of managing Dogpound.

16

The parties dispute whether the Plaintiff directed the work of other Dogpound employees. The Plaintiff was assigned to supervise four employees. Athayde Tr., 148:8-11. But he testified that, although reports were assigned to him, "they are all going to Kirk directly and not reporting anything to me but just acting off their own authority. And, therefore, my role is becoming progressively superfluous." Id. at 147:23-148:7. Based on this testimony, a reasonable jury could find that the Plaintiff did not, in practice, supervise other employees.

The parties also dispute the extent of the Plaintiff's authority to hire and fire employees. Myers testified: "I don't think [the Plaintiff] officially hired or fired, but he definitely had a strong influence in hiring and firing, both." Myers Tr., 222:1-3. Myers, however, could think of only one example, which involved furloughing an employee named Olivia. Id. at 222:4-14. Based on the Plaintiff's testimony, his only role in Olivia's furlough involved reviewing her social media with Myers, and "based off of that, [Myers] was like, okay she's gone." Athayde Tr., 150:20-151:22. Given that the Defendants provide just one example of the Plaintiff's involvement in a hiring or firing decision, and in that one example, the Plaintiff did not actually make the decision, a reasonable jury could find that the Plaintiff lacked the authority to hire and fire employees.

Finally, a reasonable jury could find that the Plaintiff lacked discretionary power at Dogpound. As described above, the Plaintiff testified that he could not actually address employee complaints, reflecting a lack of discretion. He also testified that, despite his promotion to CXO, he felt "that it was a glorified title but not actually given proper autonomy or authority to executive [sic] on any of the items within my purview." Athayde Tr., 127:8-17. He explained that his "responsibilities, whether it was, you know, partnerships, activations, social media, other

17

people were really making call those," and that other people "were executing on it versus me actually having a say on it." Id. at 127:25-128:8. The Plaintiff then named several employees who were exercising the discretion that, with his CXO title, should have been his. Id. at 128:9-15. Based on the Plaintiff's testimony, a reasonable jury could find that he lacked discretionary authority at Dogpound.

Aside from the salary threshold, a reasonable jury could find for the Plaintiff on every executive exemption factor. Accordingly, the undisputed facts do not establish the executive exemption defense. Given this, and the disputed facts regarding the Plaintiff's hours, the Court DENIES the Defendants summary judgment on the Plaintiff's NYLL claim.

## CONCLUSION

The Defendants' motion for summary judgment is GRANTED as to the Plaintiff's breach of contract, promissory estoppel, fraud, and quantum meruit claims. The Defendants' motion for summary judgment is DENIED as to the Plaintiff's New York Labor Law claim.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 53.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:   August 20, 2024
         New York, New York